## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

CRAIG BELLER,

            Plaintiff,

    v.

WAL-MART TRANSPORTATION,
LLC AND WAL-MART STORES EAST,
LP,

            Defendants.

**Case No. 2:17-cv-530**

**Judge Graham**

**Magistrate Judge Vascura**

## OPINION AND ORDER

Plaintiff, Craig Beller, brings this action against Defendants Wal-Mart Transportation, LLC and Wal-Mart Stores East, LP (collectively, the "Defendants" or "Walmart") claiming: (1) age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 623 et seq. (the "ADEA"); (2) disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12112 et seq. (the "ADA"); (3) disability discrimination in violation of Ohio Revised Code §§ 4112.02 and 4112.99; (4) defamation; and (5) wrongful discharge in violation of public policy. (Am. Compl. ¶¶ 32–75, ECF No. 15 at 79–84.) This matter is before the Court on Defendants' Motion for Summary Judgment on these claims. (Defs.' Mot. Summ. J., ECF No. 36.) For the reasons that follow, Defendants' motion is **GRANTED**.

### I. Background

Mr. Beller is an experienced commercial truck driver and former Walmart employee who worked at Defendants' joint location in Grove City, Ohio beginning in 2000. (*Id.* at ¶¶ 8–11, ECF No. 15 at 77.) Walmart's commercial truck drivers are subject to its zero-tolerance Department of Transportation ("DOT") Drug and Alcohol Policy (the "Walmart Policy") (ECF No. 32 at 337, Ex. 1), which requires drivers to submit to random drug testing. (*Id.* at 340; ECF No. 36 at 804.)

1

After arriving for work on May 31, 2016, Mr. Beller was instructed by Safety Manager James Murphy to report for a random drug test at the DOT Grove City clinic. (ECF No. 15 at ¶ 13; Murphy Dep. ¶¶ 15–21 at 41, ECF No. 33 at 494.) Mr. Beller reported to the clinic and was unable to provide a sufficient urine specimen during his initial attempt. (Beller Dep. ¶¶ 4–8 at 32, ECF No. 32 at 189.)

An employee's inability to produce a sufficient urine specimen triggers the "shy bladder" regulation, 49 C.F.R. § 40.193. The "shy bladder" protocol requires the collector to "urge the employee to drink up to 40 ounces of fluid, distributed reasonably through a period of up to three hours, or until the individual has provided a new urine specimen, whichever occurs first." *Id.* at § 40.193(b)(2). The clinic provided Mr. Beller with two bottles of water, but he was unable to provide a urine specimen during the ensuing three-hour period. (Beller Dep. ¶¶ 4–7, 20–21 at 31, ECF No. 32 at 189.) If an employee cannot provide a sufficient specimen within three hours, the collector is required to discontinue the collection, make note of the incident, and immediately notify the employer. 49 C.F.R. § 40.193(b)(4).

The clinic notified Mr. Murphy that Mr. Beller was unable to provide a sample on demand. (ECF No. 15 at ¶ 14; Murphy Dep. ¶¶ 20–25 at 49, ECF No. 33 at 502.) Mr. Murphy and General Transportation Officer Jonathan Gaupp reviewed the Walmart Policy, which also states:

> If a Driver is unable to provide a sufficient amount of breath or urine sample for a valid alcohol or drug test, the Driver will be removed from all safety sensitive functions. The Driver will be directed by Walmart to obtain a medical evaluation from a (MD) Medical Doctor or Doctor of Osteopathy (DO) who has expertise in the medical issues raised by the Driver for failing to provide a sufficient breath or urine specimen. The evaluation must be performed within five days following the invalid alcohol or drug test. If the MD or DO concludes there is not an adequate basis for determining that a medical condition has, or with a high degree of probability could have, precluded the employee from providing a sufficient amount of breath or urine specimen, this constitutes a refusal to test.

(ECF No. 32 at 348.)

Messrs. Murphy and Gaupp shared this provision with Mr. Beller, and immediately suspended him in accordance with the Walmart Policy. (Murphy Dep. ¶¶ 3–10 at 50, ECF No. 33 at 503.)

The following day, Mr. Beller consulted his primary care physician, Dr. Ahmed. (Beller Dep. ¶¶ 11–24 at 35, ¶1–7 at 36, ECF No. 32 at 192–93.) After examining Mr. Beller, Dr. Ahmed could not provide a medical reason for Mr. Beller's inability to provide a urine sample and did not administer a drug test. (*Id.* ¶¶ 1–8 at 38, 195.) Dr. Ahmed drafted a letter noting that Mr. Beller was capable of "void[ing] normally and has had no prior problem or none afterwards. His renal function and PSA test and other labs were all normal in April this year and the report is attached." (*Id.* Ex. 15, 389.) On June 2, 2016, Mr. Beller commissioned his own drug test at a local hospital in Dover, Ohio, where he tested negative for drugs. (*Id.* ¶¶ 9–19 at 38, 195.) Walmart refused to accept this test, as it was unverified and from an unauthorized third-party provider. (ECF No. 15 at ¶ 18.)

Upon receiving notification from the DOT clinic concerning Mr. Beller's insufficient specimen, Mr. Murphy contacted Walmart's Designated Employer Representative ("DER"), Megan Iseler, to determine how to proceed with Mr. Beller's medical evaluation. (Murphy Dep. ¶¶ 15–17 at 56, ¶¶ 23–24 at 58, ECF No. 33 at 508, 511.) Per DOT regulations, Ms. Iesler was required to consult with the Medical Review Officer ("MRO"), Dr. Stephen Kracht, to "direct the employee to obtain, within five days, an evaluation from a licensed physician, acceptable to the MRO, who has expertise in the medical issues raised by the employee's failure to provide a sufficient specimen." 49 C.F.R. § 40.193(c); (Iseler Dep. ¶¶ 24–25 at 17, ECF No. 35 at 735.) Ms. Iseler recommended Mr. Murphy contact OhioHealth WorkHealth ("OhioHealth"), who had previously managed Walmart's drug testing program, for assistance in identifying a licensed

physician who was familiar with evaluating a "shy bladder." (Murphy Dep. at ¶¶ 15–25 at 55, ¶¶ 8–11 at 57, ECF No. 33 at 508, 510.) OhioHealth referred Mr. Murphy to Dr. J. Todd Davis, MD. (*Id.* ¶¶ 4–5 at 56, 509.)

Dr. Davis is board certified in family medicine. (Davis Dep. ¶¶ 5–6; ECF No. 34 at 661.) During his residency, Dr. Davis received training in performing digital rectal exams, ordering PSA tests, and documenting medical histories of men with urination problems. (Davis Dep. ¶¶ 5–6, ¶¶ 8–20 at 15, ECF No. 34 at 661, 670.) While employed as a physician at OhioHealth, Dr. Davis treated injured workers and conducted preemployment physicals to assess physical or medical restrictions. (*Id.* ¶¶ 22–25, ¶¶ 1–11 at 4–5, ECF No. 34 at 659–60.)

Dr. Davis evaluated Mr. Beller on June 6, 2016 to determine whether there was "an adequate basis for determining that a medical condition has, or with a high degree of probability could have, precluded the employee from providing a sufficient amount of breath or urine specimen" as outlined in the Walmart Policy and in accordance with DOT regulations. (ECF No. 32 at 348); 49 C.F.R. § 40.193(d)(1). DOT regulations state, "a medical condition includes an ascertainable physiological condition (e.g., a urinary system dysfunction) or a medically documented pre-existing psychological disorder, but does not include unsupported assertions of 'situational anxiety' or dehydration." 49 C.F.R. § 40.193(e). The Shy Bladder Evaluation Instruction Form Dr. Kracht sent to Dr. Davis further clarifies that, "only in the extreme case will BPH [benign prostate hypertrophy] qualify as a medical excuse for not providing urine (i.e., hydronephrosis from outlet obstruction)." (Davis Dep., Pl.'s Ex. D, ECF No. 34 at 706.)

During Dr. Davis's evaluation, Mr. Beller did not mention having any difficulty urinating. (Beller Dep. ¶¶ 16–18 at 48, ECF No. 32 at 205.) Dr. Davis reviewed Mr. Beller's previous lab work and conducted his evaluation per the instructions provided by Dr. Kracht, including

performing a digital rectal exam[1] to assess the size of Mr. Beller's prostate and detect any rectal masses. (Davis Dep., Pl.'s Ex. E., ECF No. 34 at 712.) After reviewing Mr. Beller's normal lab results, assessing Mr. Beller's prostate to be a normal weight of 20 grams,[2] and finding no rectal masses present, Dr. Davis determined there was no medical condition preventing Mr. Beller from providing a sufficient urine specimen. (*Id.*)

Dr. Davis sent his evaluation to Dr. Kracht for a final determination. (ECF No. 32 at 382.) Dr. Kracht agreed with Dr. Davis's findings and concluded there was no medical condition prohibiting Mr. Beller from providing a sufficient urine specimen. (*Id.*) Under DOT regulations, if a medical condition did not preclude the driver from providing a urine specimen, the driver's failure to provide a sufficient sample is marked as a "Refusal to Test." 49 C.F.R. § 40.193(d)(2). Pursuant to DOT regulations and the Walmart Policy, Mr. Beller's specimen result was marked as a "Refusal to [T]est." (*Id.*; ECF No. 35 at 784.)

Under the Walmart Policy, "[a] refusal to test is treated the same as a positive test." (ECF No. 35 at 784.) The Walmart Policy further states that, "A Driver who has a verified positive drug or alcohol test will be immediately removed from a safety sensitive function and will be terminated." (*Id.* at 785.) On June 20, 2016, Defendants terminated Mr. Beller's employment. (Am. Compl. ¶ 24, ECF No. 15 at 79.)

---

[1] "As an initial diagnostic procedure, physicians who are examining men complaining of prostate or urinary system problems conduct a DRE. During a DRE, the physician inserts a finger into the patient's anal canal to feel a portion of the prostate gland through the rectal wall." *Short v. United States*, 908 F. Supp. 227, 230 (D. Vt. 1995).

[2] The normal prostate weighs between 20 to 30 grams, whereas most prostates with nodular hyperplasia can weigh between 50 and 100 grams. Neil F. Wasserman, *Benign Prostatic Hyperplasia: A Review and Ultrasound Classification,* 44 RADIOLOGIC CLINICS OF N. AM. 689–710 (2006). Courts may judicially notice facts which are "not subject to reasonable dispute" because they are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "Well-known medical facts are the types of matters of which judicial notice may be taken." *Hines v. Secretary of Health and Human Services,* 940 F.2d 1518, 1526 (Fed. Cir. 1991) (citing *Franklin Life Insurance Co. v. William Chapman & Company,* 350 F.2d 115, 130 (6th Cir. 1965).

Following his termination, Mr. Beller returned to his primary care physician, Dr. Ahmed, for an additional assessment. (ECF No. 32 at 390.) This time, Dr. Ahmed noted in a second letter dated June 20, 2016 that Mr. Beller had, "been having urinary outflow obstructive symptoms for some months." (*Id.*) Though Dr. Ahmed acknowledged Mr. Beller's previously normal prostate exam, he recommended, "evaluation for urethral structure vs neurogenic bladder/overactive bladder." (*Id.*) Dr. Ahmed referred Mr. Beller to a urologist for further evaluation. (*Id.*)

On June 22, 2016, Ms. Iesler assisted Mr. Beller in providing Dr. Davis with a copy of Dr. Ahmed's second letter to "possibly explain the reason for an insufficient urine sample." (ECF No. 35 at 790.) On June 23, 2016, Dr. Davis reviewed Mr. Beller's submission and amended his earlier Shy Bladder Evaluation Report to state, "There is no evidence of urinary complaints or workup prior to his shy bladder incident. My evaluation has not changed since initial examination." (Davis Dep., Pl.'s Ex. E, ECF No. 34 at 709.)

On June 29, 2016, Mr. Beller was evaluated by a urologist, Dr. Michael Gigax. (*Id.*, Pl.'s Ex. G, ECF No. 34 at 717.) Dr. Gigax performed a scope of Mr. Beller's urethra tube to examine his prostate (*Id.* ¶¶ 8–10 at 71, ECF No. 32 at 228) and drafted a letter dated June 30, 2016 documenting his determination that Mr. Beller had, "significant lower urinary tract symptoms secondary to benign prostatic hyperplasia"[3] and recommended surgery to correct the problem. (*Id.*,

---

[3] Benign prostatic hyperplasia, also referred to as "benign prostate hypertrophy" or "BPH", is defined as an "age-associated enlargement of the prostate." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 894 (32d ed. 2012). "Sources typically used to take judicial notice include 'a dictionary, public record, or even a newspaper article.'" *W. & S. Life Ins. Co. v. JPMorgan Chase Bank, N.A.*, 54 F. Supp. 3d 888, 898 (S.D. Ohio 2014) (quoting *Pearce v. Faurecia Exhaust Sys., Inc.*, 529 F. App'x 454, 459 (6th Cir. 2013)). *See Mathis v. Sudhir*, No. 1:13-cv-187, 2015 U.S. Dist. LEXIS 76908, at *15 (W.D. Mich. Mar. 20, 2015) (describing BPH as "a common urological condition caused by the non-cancerous enlargement of the prostate gland as men get older"). During his deposition, Dr. Davis also confirmed that benign prostatic hyperplasia is, "[a]n enlargement of the prostate." (Davis Dep. ¶ 18 at 20, ECF No. 34 at 675.)

Pl.'s Ex. G, ECF No. 34 at 717.) Dr. Gigax also stated the likelihood that Mr. Beller would have, "significant urinary hesitancy and difficulty producing a urine specimen on demand." (*Id.*)

Following his appointment with Dr. Gigax, Mr. Beller contacted Ms. Iesler to see if he could submit additional documentation to Dr. Davis for a further reevaluation of his shy bladder incident. (Iesler Dep., Ex. 6, ECF No. 35 at 789.) Ms. Iesler emailed the MRO's Office concerning Mr. Beller's inquiry. (*Id.*) The MRO's Office responded, "If the donor can convince the original evaluating physician that there was a medical condition present at the time of the drug test and to amend his original findings, the MRO can revisit the result based on that." (*Id.*) Ms. Iesler shared this response with Mr. Beller and encouraged him to submit additional documentation to Dr. Davis for further review. (Iesler Dep., Ex. 9, ECF No. 35 at 795.)

On June 30, 2016, Mr. Beller sent Dr. Gigax's letter to Dr. Davis via certified mail for further consideration of his initial determination. (Beller Dep. ¶¶ 5–24, 1–24 at 58–59, 215–16.) According to Mr. Beller, Dr. Davis refused to consider Dr. Gigax's letter, and Dr. Davis later confirmed reviewing the letter for the first time during his deposition. (*Id.* ¶¶ 20–23 at 58, 215; Davis Dep. ¶¶ 3–8 at 20, ECF No. 34 at 675.) Dr. Davis also admitted that Dr. Gigax's letter could have possibly changed his earlier evaluation of Mr. Beller had he reviewed it sooner. (Davis Dep. ¶¶ 19–24 at 20, ECF No. 34 at 675.)

As a final attempt to submit Dr. Gigax's letter to the MRO, Mr. Beller's wife contacted the MRO's office and was informed that Dr. Kracht would not speak with the Bellers. (Beller Dep. ¶¶ 4–20 at 89, ECF No. 32 at 246.) Mr. Beller followed up with a certified letter to Dr. Kracht dated July 4, 2016. (*Id.,* Ex. 17, ECF No. 32 at 393–94.) In his letter, Mr. Beller relayed Dr. Davis's refusal to consider Dr. Gigax's letter and asked Dr. Kracht to please review the documentation as

evidence of "a medical condition that prevented me from being able to provide a urine specimen on demand." (*Id.*)  Mr. Beller never received a response.  (*Id.* ¶¶ 4–6 at 93, 250.)

Mr. Beller filed this action one year later on June 20, 2017. (Compl., ECF No. 1).  In his amended complaint, Mr. Beller alleges five causes of action: (1) age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 623 et seq. (the "ADEA"); (2) disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12112 et seq. (the "ADA"); (3) disability discrimination in violation of Ohio Revised Code §§ 4112.02 and 4112.99; (4) defamation; and (5) wrongful discharge in violation of public policy. (Am. Compl., ECF No. 15).  Mr. Beller has since conceded his ADEA and defamation claims (Pl.'s Resp. Opp. Defs.' Mot. Summ. J. 1, ECF No. 39 at 828), leaving only his disability discrimination claim in violation of both the ADA and Ohio Revised Code §§ 4112.02 and 4112.99 and his wrongful discharge in violation of public policy claims for the Court's consideration.

## II. Standard of Review

Defendants have moved for summary judgment under Federal Rule of Civil Procedure 56. Under Rule 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt,* 586 F.3d 459, 465 (6th Cir. 2009).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record, "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

A district court considering a motion for summary judgment "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Revis v. Meldrum,* 489 F.3d

273, 279 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986); *see Dominguez v. Corr. Med. Servs.,* 555 F.3d 543, 549 (6th Cir. 2009). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Revis,* 489 F.3d at 279–80 (quoting *Anderson,* 477 U.S. at 251–52).

## III. Discussion

Defendants seek judgment in their favor on Mr. Beller's remaining claims of disability discrimination and wrongful discharge in violation of public policy. (Defs.' Reply Supp. Mot. Summ. J. 1, ECF No. 40 at 859). Though Mr. Beller presents his disability discrimination claims under both the ADA and Ohio Revised Code §§ 4112.02 and 4112.99 as one claim for relief under each, each disability discrimination claim is actually premised on two separate theories.

Mr. Beller's first theory is that Walmart terminated him because of his disability, followed by his second theory that Walmart failed to offer him the reasonable accommodation he requested. (Am. Compl. ¶¶ 48–49, 54, 56, ECF No. 15 at 81–82.) Therefore, the Court will evaluate his disability discrimination claims accordingly by first considering his "because of disability" claim and then turning to his "failure to accommodate" claim. *Jones v. Honda of Am. Mfg.*, No. 3:13-cv-167, 2015 U.S. Dist. LEXIS 28682, at *21 (S.D. Ohio Mar. 9, 2015) (requiring a separate analysis of a disability claim relying on two theories). Furthermore, as Mr. Beller's state law disability discrimination claims are subject to the same fate as his ADA claims, the Court will not separately address them. "'[W]e consider the ADA and [Ohio] state law claims

simultaneously by looking to the cases and regulations that interpret the ADA.'" *Rorrer v. City of Stow,* 743 F.3d 1025, 1031 n.1 (6th Cir. 2014) (quoting *Talley v. Family Dollar Stores of Ohio, Inc.,* 542 F.3d 1099, 1105 n.3 (6th Cir. 2008)); *Jakubowski v. Christ Hosp., Inc.,* 627 F.3d 195, 201 (6th Cir. 2010) (determining that "analysis of claims made pursuant to the Americans with Disabilities Act applies to claims made pursuant to Ohio Revised Code § 4112.02").

### A. Wrongful Termination Because of Disability

Defendants claim they are entitled to summary judgment on the "because of disability" portion of Mr. Beller's disability discrimination claim, because Mr. Beller failed to address any of their arguments concerning his alleged wrongful termination. (ECF No. 40 at 859, 863.)  To prove a *prima facie* case of disability discrimination under the ADA, Mr. Beller must show that: 1) he was protected under the ADA; 2) Defendants knew he was protected; 3) Defendants took an adverse action against him; and 4) there was a causal connection between the adverse action and Mr. Beller's protected status. *Bailey v. Real Time Staffing Servs.,* 543 F. App'x 520, 523 (6th Cir. 2013).

Defendants articulate these same elements in their motion for summary judgment and argue that Mr. Beller cannot set forth a *prima facie* case of disability discrimination, because he cannot provide evidence that either he or Walmart knew he suffered from a disability protected by the ADA at the time of his termination. (ECF No. 36 at 816–17.)  Defendants contend that absent this proof, Mr. Beller "cannot establish . . . a causal connection between his termination and his alleged disability." (*Id.* at 817.)  Defendants point out that for Mr. Beller to prevail on his "because of disability" theory, Mr. Beller must show that Defendants took an adverse action against him "'on the basis of disability.'" (*Id.* at 816 n.3) (quoting 42 U.S.C. § 12112(a)).  They further assert that because Mr. Beller cannot provide the necessary proof to show that his

disability was a "but-for' cause of the employer's adverse decision," his wrongful termination "because of disability" claim fails as a matter of law. (*Id.* (citing *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012)) (quoting *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 176 (2009)).

Upon reading Mr. Beller's response in opposition (ECF No. 39), the Court notes his failure to respond to Defendants' arguments concerning his theory of wrongful termination "because of disability." While Mr. Beller recites the ADA's mandate that "it is unlawful for an employer to 'discriminate against a qualified individual on the basis of disability,'" (ECF No. 39 at 844) (quoting 42 U.S.C. § 12112(a)), he then directs the Court to the reasonable accommodation portion of the statute. Thereafter, the only arguments advanced by Mr. Beller in response to Defendants' motion are 1) why "[a] failure to accommodate is a form of discrimination under the ADA" and 2) why his "wrongful discharge in violation of public policy" claim constitutes an exception to the general prohibition against an employee's private right of action under the DOT drug testing procedures. (*Id.* at 845, 850–52.)

The Sixth Circuit's position on a plaintiff's abandonment of a claim is well established. "[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.,* 545 F. App'x 368, 372 (6th Cir. 2013) (citing *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) (holding that a district court properly declines to consider the merits of a claim when a plaintiff fails to address it in a response to a motion for summary judgment); *Clark v. City of Dublin*, 178 F. App'x 522, 524-25 (6th Cir. 2006) (recognizing that the failure to respond properly to motion for summary judgment arguments constitutes abandonment of a claim)). As Mr. Beller never addresses Defendants' arguments concerning his theory of wrongful termination "because of

disability" in his response to their motion for summary judgment, he is deemed to have abandoned that claim. Accordingly, Defendants are entitled to judgment as a matter of law on the "because of disability" portion of Mr. Beller's disability discrimination claim.

### B. Failure to Accommodate

Mr. Beller does, however, respond to Defendants' arguments concerning his disability discrimination claim premised on a theory of a "failure to accommodate." In an attempt to save this portion of his claim, Mr. Beller argues that Defendants failed to accommodate his recently diagnosed benign prostatic hyperplasia ("BPH") disability when they failed to consider Dr. Gigax's letter as proof of a medical condition precluding his ability to provide a urine specimen on demand. (ECF No. 39 at 845.) Unlike a disability discrimination claim premised on wrongful termination "because of disability," the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) does not apply to a failure to accommodate theory. *Kleiber v. Honda of Am. Mfg., Inc*., 485 F.3d 862, 868 (6th Cir. 2007) (explaining that "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination" and "consequently are suitable for analysis under the direct-evidence framework"); *see also Jones v. Honda of Am. Mfg.,* No. 3:13-cv-167, 2015 U.S. Dist. LEXIS 28682, at *19–20 (S.D. Ohio Mar. 9, 2015). To meet his burden, Mr. Beller is not required to show pretext, but he still must point to some evidence that demonstrates a genuine dispute of material fact as to whether Walmart reasonably accommodated his disability. *Jones*, 2015 U.S. Dist. LEXIS 28682, at *51.

To establish a *prima facie* case of an employer's failure to accommodate, Mr. Beller must prove that (1) he is disabled, (2) he is otherwise qualified for the position, with or without reasonable accommodation, (3) his employer knew or had reason to know about his disability,

(4) he requested an accommodation, and (5) the employer failed to provide the necessary accommodation. *Melange v. City of Ctr. Line*, 482 F. App'x 81, 84 (6th Cir. 2012). To survive summary judgment, the party bearing the burden of proof must present a jury question as to each element. *Davis v. McCourt,* 226 F.3d 506, 511 (6th Cir. 2000). Here, that burden lies with Mr. Beller. Defendants argue that Mr. Beller lacks proof of the third element, because neither he nor Defendants knew he suffered from any disability prior to his termination. (ECF No. 40 at 866.) The Court agrees.

Mr. Beller has failed to provide proof evidencing that Defendants were either aware or should have been aware of his disability prior to his termination. The undisputed facts demonstrate that Mr. Beller was terminated on June 20, 2016. (Am. Compl. ¶ 24, ECF No. 15 at 79.) Similarly, it is undisputed that Mr. Beller's diagnosis was not documented until June 30, 2016. (Beller Dep., Ex. 16, ECF No. 32 at 392.) The only evidence Mr. Beller points to as proof of Defendants' knowledge is an alleged attempt on June 13, 2016 to relay to Safety Manager, Mr. Murphy, that a medication he was taking at the time of his test might cause side effects and might have impaired his ability to provide a sufficient urine specimen. (ECF No. 39 at 836.)

The Sixth Circuit has addressed an employee's unestablished assertion concerning an alleged medical condition and found that the employer "was entitled to require that [the plaintiff] provide medical documentation sufficient to prove that he had a condition requiring accommodation." *Kennedy v. Super. Printing Co.,* 215 F.3d 650, 656 (6th Cir. 2000). "'If this were not the case, every employee could claim a disability warranting special accommodation yet deny the employer the opportunity to confirm whether a need for the accommodation exists.'" *Id.* (quoting *E.E.O.C. v. Prevo's Family Market, Inc.,* 135 F.3d 1089, 1094–95 (6th Cir.1998)).

Defendants further assert that even if Mr. Beller was disabled at the time of his test, his failure to accommodate claim still cannot survive summary judgment, because he cannot provide evidence that he requested an accommodation prior to his termination on June 20, 2016. (ECF No. 40 at 866.) The Sixth Circuit has considered this issue too and found that even if a physician's letter could be construed as a request for accommodation, it could not provide the basis for the plaintiff's failure to accommodate claim, because it was not received by his former employer until after he was terminated. *Melange,* 482 F.App'x at 86–87. The same holds true here. It is undisputed that Dr. Gigax's letter is dated ten days after Mr. Beller's termination. (Beller Dep., Ex. 16, ECF No. 32 at 392.) Thus, even if Defendants and this Court had considered Dr. Gigax's letter to be a request for accommodation, it cannot provide the basis for Mr. Beller's failure to accommodate claim, because it was received well over a week after he was terminated.

Mr. Beller nonetheless insists that Defendants had an obligation to participate in the interactive process, mandated by the ADA, to identify potential reasonable accommodations to overcome his insufficient urine specimen. (ECF No. 39 at 846.) Specifically, he argues that Defendants failed to meet their obligation by denying his opportunity to provide a valid medical reason for his inability to urinate. (*Id.* at 847–48.)

In making this argument, Mr. Beller overlooks several key factors. First, Defendants had no obligation to engage in the interactive process post termination. While "[g]enerally, a disabled employee's request for an accommodation triggers an employer's duty to participate in the interactive process to attempt to identify an appropriate accommodation," Mr. Beller was no longer employed by Defendants when he made his request. *Lowe v. Hamilton Cnty. Dep't of Job & Family Servs.,* No. 1:05-cv-117, 2012 U.S. Dist. LEXIS 74018, at *18 (S.D. Ohio May 29, 2012). Therefore, Defendants had no obligation to engage in the interactive process and consider

any post termination accommodation requests he made. *Jones v. Con-way Freight, Inc.*, No. 3:12-cv-724-GCM, 2014 U.S. Dist. LEXIS 36768, at *12 (W.D.N.C. Mar. 20, 2014) (determining the employer had no obligation to entertain accommodations after the fact).

Mr. Beller also fails to recognize that DOT regulations do not permit the MRO to "consider later evaluations of [the] [p]laintiff by other doctors." *Melman v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 3:08-cv-01205, 2010 U.S. Dist. LEXIS 78488, at *25 (M.D. Tenn. Aug. 2, 2010) (discussing the requirements of 49 C.F.R. § 40.193(h)). Even if Dr. Kracht had considered Dr. Gigax's letter, his review of the letter would have been outside the scope of what he is permitted to consider and therefore could not have been used to negate his previous conclusion. *See id.* Section 40.193(h) requires the MRO to "seriously consider and assess the referral physician's recommendations in making [a] determination about whether the employee has a medical condition" precluding the employee from providing a sufficient urine specimen. 49 C.F.R. 40.193(h). The regulation does not provide for any consideration of other documentation.

Mr. Beller also misapplies the district court's reasoning in *Melman*, where the court stated, "The ability for an employee with a valid medical reason for his inability to provide a sufficient sample to have his test cancelled and resume work obviates ADA . . . concerns." *Melman*, 2010 U.S. Dist. LEXIS 78488, at *30. Mr. Beller uses the district court's statement as support for the proposition that his request for review of additional medical documentation was a reasonable accommodation request. (ECF No. 39 at 847.) But what the district court in *Melman* is referring to is the opportunity for the plaintiff to have his drug test cancelled based upon a physician's evaluation pursuant to the shy bladder regulation, 49 C.F.R. § 40.193. *Melman*, 2010 U.S. Dist. LEXIS 78488, at *30 (discussing "the possibility of cancelling a random drug test is sufficient to accommodate medical conditions that prevent urination.").

The evidence overwhelmingly demonstrates that Defendants provided Mr. Beller with the exact opportunity contemplated by both the regulation and the *Melman* court. While still under their employment, Defendants sent Mr. Beller to a referral physician, Dr. Davis, to determine whether there was "an adequate basis for determining that a medical condition has, or with a high degree of probability could have, precluded the employee from providing a sufficient amount of breath or urine specimen" in accordance with DOT regulations and as outlined in the Walmart Policy. 49 C.F.R. § 40.193(d)(1); (ECF No. 32 at 348.) Contrary to Mr. Beller's belief, he was given "the ability to eliminate the ADA concerns" he refers to in his memorandum in opposition. (ECF No. 39 at 848.) He simply did not meet the regulatory requirements that would have allowed cancellation of his random drug test. *See* 49 C.F.R. § 40.193(d)(1).

Assuming, arguendo, that Dr. Davis had agreed to review Dr. Gigax's letter and made a different recommendation to Dr. Kracht, Mr. Beller has failed to demonstrate that Dr. Gigax's diagnosis describes the type of BPH constituting a medical excuse for an insufficient urine specimen. The undisputed facts show that the Shy Bladder Instruction Form Dr. Kracht provided to Dr. Davis contains a special note concerning common claims not qualifying as a medical excuse. (ECF No. 34 at 706.) One of those common claims is BPH, where Dr. Kracht specifies that, "only in the extreme case will BPH qualify as a medical excuse for not providing urine (i.e., hydronephrosis[4] from outlet obstruction)." (*Id.*)

During his evaluation of Mr. Beller, Dr. Gigax found "significant lower urinary tract symptoms secondary to benign prostatic hyperplasia [BPH]" and noted "the likelihood that Mr.

---

[4] Hydronephrosis is "cystic distension of the kidney caused by the accumulation of urine in the renal pelvis as a result of obstruction to outflow and accompanied by atrophy of the kidney structure and cyst formation." *See* MERRIAM-WEBSTER'S ONLINE MEDICAL DICTIONARY, available at https://www.merriam-webster.com/medical/hydronephrosis (last visited Mar. 24, 2019); *see also W. & S. Life Ins. Co. v. JPMorgan Chase Bank, N.A.*, *supra* note 3 at 898 (discussing judicial notice of dictionaries).

Beller would have, "significant urinary hesitancy and difficulty producing a urine specimen on demand." (*Id.* at 717.) Not only does Dr. Gigax's letter reflect one of the common claims Dr. Kracht identifies as not constituting a medical excuse, his letter makes no mention of hydronephrosis or any obstruction to the outflow of urine indicating an extreme case of BPH. (*Id.*) Absent an extreme case of BPH, Dr. Gigax's diagnosis would not qualify as a "medical excuse for not providing urine" under Dr. Kracht's standards. (*Id.* at 706.)

As Mr. Beller points out to the Court, "the MRO retains [the] ultimate discretion" in determining whether a medical condition exists. (ECF No. 39 at 847.) While the MRO is required to "seriously consider and assess the referral physician's recommendations," the MRO makes the final determination, and the MRO in this case has already stated his policy on BPH claims, as outlined in the instruction form he provided to Dr. Davis. 49 C.F.R. § 40.193(h); (ECF No. 34 at 706.) Therefore, even if Dr. Davis had reviewed Dr. Gigax's letter and made a different recommendation to Dr. Kracht, Mr. Beller has failed to provide any evidence demonstrating that his BPH diagnosis constitutes an extreme case of BPH qualifying as a medical excuse, which would have resulted in Dr. Kracht's cancellation of his test.

As Mr. Beller cannot meet his burden to submit evidence creating a genuine dispute of material fact regarding whether Defendants knew or had reason to know about his disability prior to his termination or whether Defendants were either obligated to provide him an accommodation or failed to provide the accommodation he requested, the Court finds his failure to accommodate claim fails as a matter of law. As there remains no genuine dispute of material fact that Defendants failed to provide Mr. Beller with a reasonable accommodation, Defendants are entitled to summary judgment on Mr. Beller's disability discrimination claim premised on this theory.

### C. Public Policy Claim

Mr. Beller further claims that he was wrongfully terminated in violation of public policy, because Walmart purportedly failed to follow the DOT random drug testing and shy bladder evaluation regulations. (Am. Compl. ¶¶ 71–73, ECF No. 15 at 83–84; ECF No. 39 at 851–52.) Mr. Beller concedes any claim that drug testing procedures were not properly followed at the DOT clinic, as he admits that, "There is no suggestion that the collector violated [his] rights." (ECF No. 39 at 832 n.6.) Therefore, Mr. Beller's only remaining public policy claim is his assertion that because he was not referred to a physician "with experience performing shy bladder evaluations," Defendants failed to follow the shy bladder protocol contained in 49 C.F.R. § 40.193. (ECF No. 39 at 851.)

Though Mr. Beller acknowledges that "Congress did not give employees a private cause of action with regard to the DOT regulations" (ECF No. 39 at 852),[5] he nonetheless argues that his claim provides an exception "where an employee has no other redress for a termination which jeopardizes a statute, rule, or constitution." (*Id.* at 853.) Mr. Beller claims the shy bladder protocol "provides a procedure to protect drivers who are unable to give a urine sample," and that he was not afforded that protection. (*Id.*).

To prevail on his wrongful discharge claim in violation of public policy under Ohio law, Mr. Beller must show that: (1) a "clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law;" (2) that "dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy;" (3) "the plaintiff's dismissal was motivated by conduct related to the public policy;" and (4) "the employer lacked overriding legitimate business justification for

---

[5] *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 308 (6th Cir. 2000) (concluding that Congress has not provided employees with a private right of action under the DOT drug testing procedures).

the dismissal." *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 311 (6th Cir. 2000) (quoting *Painter v. Graley*, 70 Ohio St. 3d 377, 639 N.E.2d 51, 57 n.8 (1994)). To survive summary judgment, Mr. Beller must present a jury question as to each element. *See Davis v. McCourt,* 226 F.3d 506, 511 (6th Cir. 2000).

Defendants argue that Mr. Beller cannot satisfy his burden, because not only, they insist, did "Walmart [follow] the DOT regulations concerning shy bladder evaluations," but Walmart also had, "an overriding legitimate business justification for [Mr. Beller's] dismissal." (ECF No. 36 at 821; ECF No. 40 at 870–72.) Defendants direct the Court to the Federal Omnibus Transportation Employee Testing Act of 1991 (the "Act"), whereby Congress instructed the Secretary of Transportation to prescribe regulations establishing a random drug and alcohol testing program for the operators of commercial motor vehicles "(i)n the interest of commercial motor vehicle safety." (ECF No. 40 at 872) (quoting 49 U.S.C. § 31306(b)(1)(A)). Defendants claim that by adhering to the stated purpose of the Act, they were justified in terminating Mr. Beller, because DOT regulations "aim to increase public safety by curtailing drug use in trucking." (ECF No. 36 at 821; ECF No. 40 at 872.)

Mr. Beller references the same policy and claims, "[t]here is a clear public policy that requires . . . Defendants to comply with [the laws and regulations] regard[ing] random drug samples."[6] (Am. Compl. ¶ 69, ECF No. 15 at 83.) Mr. Beller also claims that his termination jeopardizes that public policy, because he was terminated for his inability to provide a sufficient urine specimen, which DOT regulations contemplate, but Defendants failed to follow. (*Id.* at ¶ 71.) Mr. Beller further avers that Defendants' failure to follow the DOT regulations resulted in the

---

[6] Mr. Beller states, "This policy is stated in the United States Code, the Federal Code of Regulations, the Omnibus Transportation Employee Testing Act and in the United States Department of Transportation Rules; including but not limited to specific sections 49 U.S.C. §5331, 49 U.S.C. §31135, 49 C.F.R. §40; 49 C.F.R. §382 and DOT guidance publications." (Am. Compl. ¶ 70, ECF No. 15 at 83).

improper classification of his drug test, and his termination was therefore motivated in whole or in part by that failure. (*Id.* at ¶¶ 71–72.) Mr. Beller maintains that under these circumstances, "[t]here was no legitimate business justification for [his] dismissal." (*Id.* at ¶ 73, ECF No. 15 at 84.)

The Court finds Mr. Beller's arguments to be without merit, as his termination was not contrary to the shy bladder procedures outlined in 49 C.F.R. § 40.193 and did not lack an overriding legitimate business justification. Following an employee's insufficient urine specimen, the shy bladder regulation charges employers to "direct the employee to obtain, within five days, an evaluation from a licensed physician, acceptable to the MRO, who has expertise in the medical issues raised by the employee's failure to provide a sufficient specimen." 49 C.F.R. § 40.193(c). The undisputed facts demonstrate that Walmart immediately contacted OhioHealth, the entity that previously managed Walmart's drug testing program, who then directed Mr. Beller, within four business days of his shy bladder incident, to Dr. Davis. (Murphy Dep. ¶¶ 4–5 at 56, ECF No. 33 at 509; ECF No. 32 at 348.) Defendants correctly point out that during her deposition, former Walmart DER, Ms. Iesler, misstated the requirements for a physician performing a shy bladder evaluation. (ECF No. 40 at 871 n.7.) Neither DOT regulations nor the Walmart Policy require the referral physician to have experience in performing a shy bladder evaluation. (*Id.*) The only requirements under both are that the doctor performing the evaluation is licensed and has expertise in the medical issues raised. (*Id.* citing § 40.193(c); ECF No. 33 at 506–07.)

Based on the evidence in the record, the Court finds no genuine dispute of material fact as to whether Dr. Davis had expertise in the medical issues raised by Mr. Beller's failure to provide a sufficient urine specimen. Dr. Davis, a licensed physician, was trained to perform digital rectal exams, order PSA tests, and to take medical histories of men with urination problems. (Davis Dep.

¶¶ 5–6, ¶¶ 8–20 at 15, ECF No. 34 at 661, 670.)  As another district court describes, "As an initial diagnostic procedure, physicians who are examining men complaining of prostate or urinary system problems conduct a [digital rectal exam] DRE. During a DRE, the physician inserts a finger into the patient's anal canal to feel a portion of the prostate gland through the rectal wall." *Short*, *supra* note 1.  Utilizing his training, Dr. Davis performed a digital rectal exam to assess Mr. Beller's prostate and reviewed his recent lab work. (ECF No. 34 at 712.)  Mr. Beller has provided no expert testimony or any authority indicating that Dr. Davis should have performed a different procedure or that the exam he performed was deficient.  Furthermore, there is nothing in the MRO's instructions to Dr. Davis suggesting he should have conducted his examination of Mr. Beller any differently. (ECF No. 34 at 706.)  The Court is therefore unconvinced that Defendants failed to direct Mr. Beller to a physician with expertise in the medical issues raised by his failure to provide a sufficient urine specimen and instead finds that Defendants complied with the shy bladder regulation.

As recited earlier, the MRO agreed with Dr. Davis's findings, and Mr. Beller's specimen result was marked as a "Refusal to [T]est," which is treated as a positive test under the Walmart Policy. (ECF No. 35 at 784.)  While DOT regulations do not mandate an employee's termination following a positive test, they do provide the employer with the discretion to take the appropriate personnel action. 49 C.F.R. § 40.305(b).  Under the Walmart Policy, "A Driver who has a verified positive drug or alcohol test will be immediately removed from a safety sensitive function and will be terminated." (ECF No. 35 at 785).  Following the Walmart Policy, Defendants terminated Mr. Beller's employment. (Am. Compl. ¶ 24, ECF No. 15 at 79.)  Consistent with the Walmart Policy, DOT regulations, and the overarching public safety purpose of the Act, the Court finds Defendants had an overriding legitimate business justification for Mr. Beller's dismissal.

There remains no genuine dispute of material fact concerning whether Defendants followed the shy bladder regulation, 49 C.F.R. § 40.193.  On the contrary, Mr. Beller's termination was the result of Defendants' adherence to Congress's public safety mandate, the shy bladder regulation, and their own zero-tolerance drug and alcohol policy.  As Mr. Beller cannot meet his burden to present a jury question as to each element of his wrongful discharge in violation of public policy claim, it too fails as a matter of law, and Defendants are also entitled to summary judgment on this claim.

**IV.    Conclusion**

For the reasons stated herein, Defendants' Motion for Summary Judgment (ECF No. 36) is **GRANTED** in its entirety.  Accordingly, Plaintiff's claims are **DISMISSED WITH PREJUDICE.**


**IT IS SO ORDERED.**


/s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: March 28, 2019